Today we have four cases scheduled for oral argument. One case is being taken on the record for purposes of our records. I'll read that into the tape so that you'll have it recorded. It's 2009-3202 Vasquez v. MSPB. That is the submitted case. The first case for oral argument is 2009-1130 Orion v. Hyundai Motors. Mr. Scherer, whenever you're ready. Good morning, Your Honor. Gene Scherer. Before you start, however, we have some housekeeping matters to take care of. Basically, the additional exhibits which were submitted at a rather late date in the program. Yes, we submitted full copies of some of the exhibits at Orion's request. They felt like the partial versions that were in the initial appendix were not sufficient, so we submitted those Monday morning. Two points on that. We still do not have a full copy of the license in the record. I presume it's in the record below? No, it's not. Is that in the record below? You do have a full copy of the Read Me First manual. Is it in the record? And it is in the record below. Is that the same as the Cass Parts manual? Yes, that's the Read Me First manual. The Cass Parts Read Me First manual. Well, we have motions to have those accepted, and I'd leave it up to the panel. Mr. Judge Lynn? That's fine with me. Both sides have agreed. You don't have any more papers to file this morning, do you? Thankfully not. No, that's good. Yes, that's fine. Motions will be granted as submitted, and I presume that the entire record will be called up once the case is submitted after the hearing. Yes, Your Honor. I'd just make a comment that the way these appendix materials were assembled, as apart from the filings and the piecemeal last-minute submissions, made it very difficult to review this record. And I would say this is not an example of the finest way to assemble and present to us a record. And, Your Honor, we apologize for the inconvenience that that has caused the Court. We thought it would be helpful to do it in chronological order, but in the end, that obviously didn't work very well. But we apologize for that. You may proceed. Thank you. Aside from the extraordinary simplicity of the invention claimed in the 627 patent, which merely computerizes a long-established method of selling parts, the record suggests two powerful reasons why the company founded by the inventor, Mr. Johnson, would be willing to sell that patent to a patent-holding company for a song. One reason, which I'll discuss in a few minutes, is that they were late to the electronic parts sales party. Competitors like Bell and Howell had already developed and extensively marketed similar systems. The other reason, though, is that they knew from their interactions with the PTO that they had a problem with their own on-sale activity. But does that really go to the issue of validity? What is the real essence of your challenge to the validity of the patent? Is it the one-year bar prior sale, or is it the anticipation? What is your strongest argument? It's both of those, Your Honor. And I'd like to begin with the on-sale bar, and I'd like to begin that discussion by addressing an issue, a clean legal issue, that is in some ways logically anterior to the consideration of the on-sale bar, and that is the critical date or filing date issue, which presents a clean and important question of law and one that we think the Court will likely want to address regardless of how you decide the other issues in the case. But, Counsel, there's nothing clean about that issue, is there? I think it is, Your Honor. I'll be interested in hearing how you clean it up. Okay. As the District Court recognized, there was ample evidence of on-sale activity and public use during the parts fair from November 10th to the 13th of 1988. And as the District Court also recognized, and again, the filing date on the face of the patent for years and years was November 13th of 1989, which would have allowed the parts fair to be under consideration for purposes of the on-sale bar. Now, as the District Court also recognized, when Johnson's company sold the patents to Orion 16 years after the patent was filed and at the time that Orion filed this lawsuit in August of 2005, the filing date was and remained November 13th, 1989, more than one year past the time of the parts fair. It wasn't until October of 2006, 14 months after filing this lawsuit, that Orion petitioned for a correction to November 10th, or they renewed a petition that had been lying dormant at the PTO for a long time. That petition was granted less than three months before the trial began, and it was only three weeks before the trial that the District Court ruled that the critical date would now be November 10th rather than November 13th. What's the relevance of all these dates, counsel? It's relevant to the Court's point in several decisions, such as Southwest Software, that it doesn't make sense from the standpoint of the public notice function of patents to allow a critical date or a filing date to be changed in mid-course, after litigation has already begun. And so what the District Court did with that last-minute change, it engaged in exactly the kind of mid-game goalpost shifting that Southwest Software and other decisions are designed to prevent. Now, although the District Court didn't analyze Southwest Software, it seems to have recognized that that decision and others like it foreclosed the application of the new filing date in pending litigation. It also seems to have recognized that because the alleged error wasn't apparent on the face of the patent, under this Court's decision in Novo and other decisions, the District Court lacked authority to correct that error on its own. So initially, the District Court adopted a different approach. It said, OK, I'm going to invoke Section 21 to extend the one-year grace period backward by three days, based on the fact that November 10th of 1989 was a federal holiday. And on that basis, the District Court ruled in a published opinion that has now been cited by other courts that, and I quote, regardless of whether the application is deemed filed on November 10th or November 13th, 1989, events occurring on November 10th, 1988 will not invalidate the patent as those events occurred during the one-year grace period of 102B. Well, isn't that really in consonance with HOLA? No, Your Honor. In fact, I believe the better reading of HOLA is not that it was changing the critical date on the back end, but that it was deeming the application to have been filed on the holiday or the weekend day. But regardless, HOLA is a decision about initial patentability, and what we're concerned about here is the authority of the PTO and the authority of the District Court to change the filing date or the critical date once litigation has already begun and indeed just a few days before trial. But isn't it true that, as HOLA pointed out, that if the weekend mailing rule of Section 21 doesn't apply to 102B or 102D, then you have an unusual, shall we say, inconsistency or incompatibility with Section 119 and the priority date that might be claimed and Section 111 with respect to provisionals? That may be true, Your Honor, but two responses to that. First of all, it does seem to me the better reading of HOLA is to say in that situation you just deem the application to have been filed on the weekend day or the holiday. You don't necessarily have to. You certainly don't change the critical date at the back end. And I don't think HOLA really stands for that. Does that mean that every patent that's issued with a Monday filing date should be deemed for purposes of 102B to have been filed on the Saturday a year before? I doubt it, but only if there's some issue like a problem with the express mail or something like that. It's an issue with respect to an asserted reference under 102B. Yeah. But in all events, the important point here, however the Court interprets HOLA and interprets Section 21, the important point is that this was a change that was made in the middle of litigation. And I'll point out that although the district court initially said that it was going to move the critical date backwards, when it came time to instruct the jury, the district court actually instructed the jury that the filing date was November 10th and therefore that the critical date was November 10th, the year earlier. That was the effective filing date, according to the district court. And that's what the court said. But we believe that was a flat-out violation of Southwest Software because even though the court initially said that he was just going to move the critical date, ultimately he gave full effect to the PTO's certificate of correction, which Southwest Software and Group One and NOVO and a number of other decisions say that you can't do in mid-litigation. We're running out of your time now. Would you mind discussing the anticipation issue? It may not be as clean an issue as this one, but we assume you do want to say something about anticipation. Absolutely, as well as the on-sale bar. So I'll come back to the on-sale bar after anticipation if it's all right. For anyone familiar with parts sales in computers, it's hard to imagine a simpler idea than the one that Johnson patented. If you merely read the claims and the patent itself, the heart of the claimed invention, of course, is claim one, which consists of four simple steps, only the last of which was contested in the anticipation case. First, the salesman finds out what the customer needs. That's the receiving step. Then he inputs that information into a computer. That's the electronically- Well, the only step that's really at issue is the last one. Is creating the proposal. Talk to that one. That's correct. Well, the first point that's important on the proposal step is to remember how the district court construed that claim. The court construed it very broadly in a way that made it very difficult to contest infringement, but also made it very easy to establish anticipation. He construed that element as merely information, any information, intended for conveyance to a customer. Now, given the undisputed facts and that controlling construction, we think there's no question that all three asserted claims here, claims one and then the dependent claims seven and eight, were anticipated by the IDB 2000 system, which was an electronic parts catalog system expressly designed, among other things, to facilitate retail parts sales. And it was widely sold and used before the district court's chosen critical date of November 10th. We recognize that the standard is high. We have to demonstrate, in order to get a new trial, we have to demonstrate that the verdict was against the great weight of the evidence. And to get judgment as a matter of law, we have to show that the verdict wasn't supported by substantial evidence. But, again, based on the undisputed facts and the binding claim construction, we think it's easy to meet both of those requirements here. Mr. Chair, could you explain to us why this issue is properly before us? And I'm speaking now with respect to the J-Mall standards 50A and 50B and the waiver problem. Right. And that issue goes only to the relief. Even if the court were to accept the district court's sua sponte finding that we waived our request for judgment as a matter of law, we would still be entitled to a new trial on the same basis. What do you mean on the same basis? Well, if we establish that the verdict wasn't supported by substantial evidence sufficient to get judgment as a matter of law, then we have necessarily established that the verdict was contrary to the great weight of the evidence. So it's not quite the same basis. It's a different standard. It's all fortiori, in our view. But, in fact, we believe, for reasons we've set out in our briefs, that we did, in fact, preserve the issue. When you look at the context in which the victim- Well, the district court didn't think that you preserved it. The only statement made that I found in the record is the statement that the district court mentioned in the decision was your comment, we next seek partial judgment as a matter of law based on prior art. And the district court has heard the testimony and the argument about that. So your argument, I assume then, is that that statement came at the end of a lengthy colloquy about the jury instructions of the record- That's exactly right. And the evidence, et cetera, and I suppose your position then is that there's only one real piece of anticipatory evidence that was in play, the IDB 2000, and the judge surely knew where you stood. Absolutely. We had talked about instructions on both obviousness and anticipation at some length over 40 pages of transcript prior to that, and our evidence on those issues had just been put on the day before. Well, was it the IDB 2000 that you were taught? Yes. Why didn't you say that? Well, the reference to prior art, the only prior art we had was this IDB 2000 system that was sold under different names. But you did assert a whole bunch of references and, of course, made the argument, and you made the argument before us here that there was single reference 103 asserted, that single reference obviousness asserted on the basis of a number of different things, not just the IDB 2000. And, of course, there was the on sale activity, which relates back to what we discussed a minute ago on the filing date. So there were a bunch of different theories and different facts that were asserted. How is the district court to discern which of those various theories and which of those various facts you were referring to in your JMAL? Well, during the discussion of the jury instructions, the prior art had been used as a term of art to encompass simply anticipation and obviousness. Our obviousness case was a very quick kind of add-on to our anticipation case, and that was the way the term was used. And, indeed, when Orion filed its 28J letter on that subject a couple of weeks ago, it referred to our anticipation and obviousness arguments as our prior art arguments. So it's been clear to the litigants and to the court throughout that that was what we were referring to. It wasn't clear to the court, though. Well, the court didn't actually say that it wasn't clear to him. The court never made a comment about it at the time the motion was made. The other side never made a comment about it at the time the motion was made. And even later, after we filed our 50B motion, the other side didn't raise the issue. There really was no confusion, and the district court itself did not say that it was confused. How about if you had said we move under 50A based on the stuff we've been talking about? Would that have worked? I don't think that would have been specific enough, probably. But when you add to that the prior art and the court has heard the evidence and argument about that, to me that was clear enough. Do you think it complies with the Fifth Circuit requirement of making the 50A motion clear enough so the judge at least understands that you are making a 50A motion? Yes. There was no doubt that we were making a 50A motion, and in context the grounds for that motion were clear. But again, regardless of whether we preserved our ability to get judgment as a matter of law, we would still be entitled to a new trial if we can establish, as I believe we have, that the IDB 2000 fully anticipated the claims of the patent that were asserted against us. Well, let me explore that with you. Would the absence of a JMAL motion in this case take off the table anticipation and obviousness? No, not at all, because we would still be seeking a new trial on both of those grounds. All right, let me ask you a different question. On the obviousness issue, which you haven't really addressed, there's a question in my mind as to whether obviousness is really in this case, and apparently it was a question in the trial judge's mind. Did you argue the case in the trial court? I did not try it. I was there for part of the trial. Can you cite us to something in the record that clearly will establish the fact that your client brought obviousness into the case in a way that the jury could understand it? Yes, there's a good chunk of testimony, well, two or three pages of testimony on obviousness, in Mr. Klausner's expert testimony at trial. I believe that's under tab 16 in the appendix. And then it's true that the district court initially said that we had never argued obviousness in our closing, but, in fact, we did, and we explained to the court where that is. And I can't remember the site off the top of my head, but I'll get it on rebuttal if you like. But the other side hasn't contested that we did, in fact, make that argument in closing. You're well under your rebuttal time, so when you do, sir, could you please give us those citations? Yes. And back to the podium. Yes. We'll restore a few minutes of your rebuttal time. Thank you. If you may please the court, my name is Frederick Fry. And there is a fundamental misconception that is throughout their opening brief and their reply brief as to what this patented invention is, and, indeed, what an invention is and what a computerized invention is. Other than that, they had the case right? They're wrong on everything else, as we pointed out in our opposition brief. But this is something that is so fundamental. An idea is literally the first step of an invention. I get an idea. I had an idea on the way to the courthouse today that I was going to create a new car, gasoline engine car, controlled by a computer, 100 miles a gallon. I sold the car. I contracted for it. I gave a delivery date. I had a price. I have no idea how I'm going to do it. Where are you going with all this? Where I'm going with all this is that this whole process started in the summer of 1987 with a development contract. Johnson testified that he was contacted by Case. They wanted to know what he would do to sell parts. So they made a proposal. There was a written development contract. That contract is not in the record. Mr. Johnson didn't have it. His company, former company Fire Pond, didn't have it. This company, Hyundai, never took any discovery in the district court. They didn't subpoena Case to see if they had it. They didn't contact any of the people that worked in Case with Mr. Johnson to develop this. Is your point that they didn't try the Case very well? Is that what you're arguing? There was a massive failure of proof on all of their attacks on the patent. Was conception an issue in the Case? You have to have conception of every step of the patent and invention. They have categorized what happened in the summer of 1987 and the Read Me First manual. They say that's an idea. They say this invention is simple. It's four manual steps. They don't understand and they say that the judge mistook the embodiment, the software embodiment that was ultimately commercialized, that the judge confused that with the patent and invention. You can't separate the software from the invention. This was a computerized method. You have to have software to have the method. A computer, I presume, would not work without the software. Is that correct? What is the real essence? What is the nub of the invention in the judgment of the court? It was to go beyond an electronics part catalog, which was what the prior art had, where you go in. In fact, I think our expert testified. You go into a part scanner. You say, I've got a dent in my bumper. I want a new bumper. The guy looks through the catalog and then he turns the catalog to you or turns the screen to you and says, okay, is this the bumper? That's where that electronics part catalog stops. This system puts together a proposal, and the proposal has price information that is intended to be conveyed to a consumer. That was not part of the IDB 2000 system. That was described by the president of Bell & Howell in his article, Exhibit 131, as a backroom system. Why do you say that was not part of the IDB 2000 system? In the appendix at tab 21, page A2439, that's a description of the IDB 2000 system, as I understand it. It says on that page, improve customer relations and profits. The efficiency you gain with the IDB 2000 can only enhance your image with your customers. It goes on to say, when they see the system in your place and when they see the results, they're impressed. When they see the results. The result was you can find the part faster. Are you suggesting that when they swing the monitor around and say, is that your bumper, that the customer would say, yes, and don't tell me the price? Wouldn't it follow from that system that somebody would say, oh, and the price is X dollars? But that's not the system generating it. That's a man going to a separate price list. Prices change all the time. He goes to a separate price list and gives you the price. So your system included the price in the picture. Our system included a proposal intended to be conveyed to the customer, and the proposal in Claim 7, it included price. In Claim 8, it included graphical information about what the part was. And isn't that exactly what the IDB 2000 did? No, that's not. It says it prompts the price. That's page 82432. The IDB 2000 had the invoice price and the customer price, and the thing that was put on the promotional video and shown to the jury, it was 100% markup on that price. That's not shown to the customer. Gump said you don't show that to a customer, that markup. What does the total price mean at that point in time? Pardon me? Why is the price difference whether it's 100% markup, 50% markup, or 200% markup that's shown to the customer? This is a selling system, and you don't sell a part to a customer by telling him, I want to charge you twice what I paid for it. I know I generally walk out. I try to get the thing somewhere else. It's not intended to be used that way. Indeed, many of those exhibits, including the Fry article and the parts vision documents and Otto's testimony, talked about this system had to be combined with an invoicing system and an inventory system in order to have a sales system, that the product itself, the IDB 2000 itself, was not a sales system. What does that have to do with the claims? Because the claims don't relate to any of those things, the invoicing or a sales system or any of that. Well, they do. It's a computerized method for selling, and the last step is to generate a proposal. Now, what does that mean, a proposal? You talk about does it mean anything more than saying, yeah, it's part number 10 and it's $12. It can have pictures on it, textual material. You're not talking about preparing a formal written contract with all sorts of specifications. You press a button, this thing puts out the proposal, which is here's the part, here's the price, and sign on the bottom. Was obviousness an issue in this litigation? Not really, because their expert, Klausner, testified repeatedly that IDB 2000 anticipated that the differences between IDB 2000 and Claim 1 were zero and that this had been done before. So all of this, I think there was actually one reference where he talked about, well, it would be obvious an individual, an ordinary person of skill in the art, which he never defined what that was. Well, there seemed to be some argument, as I read the trial judge's opinion, there seemed to be some argument over whether you could have obviousness based on one prior art reference. What was that about? That the jury instructions defined ordinary skill in the art and had many other references that made it crystal clear that those instructions as a whole would take what one of ordinary skill in the art knew, his knowledge of the art, could be added to the prior art to come up with the invention. So their argument now on appeal is that the judge is basically saying you can only have obviousness when you are combining prior art items and that's not the thrust of the jury instructions as a whole. I mean, I can read them to you, I can give you... You don't need to do that, but with respect to anticipation, was there a missing step in anticipation? Step D. Preparing a proposal. Preparing a proposal. The last step. That was a price part that you're saying was necessary in order to anticipate. What I was saying was that they showed wholesale or invoice price, which was not something that was intended to be conveyed to a customer. It was not something that you put into a proposal. So they didn't have that. But the claim didn't require a price to be shown to the customer. Claim 7 did. Dependent Claim 7 did. Dependent Claim 8 required graphical information. Well, even the other one showed a graphical information would show a price, but not necessarily the price that you're saying would entice the customer into buying. But there was a price shown in their system. There's no evidence that that was shown to the customer. Remember, this is supposedly a backroom system used for the parts manager. It's a lookup catalog, and that's where it ended. In the GM system, which is what first got this, there wasn't even any price information. The entire General Motors system, I think there were 10,000 dealers that bought this. It's in the record. There was no price information. That's what Mr. Gump testified to. That may be why GM is where it is, but that's another matter. Your view of the 50A motion. I take it your view is the 50A motion was inadequate, and they did not preserve J Maul under their 50B motion. Assuming that to be the case, what's the consequence for this court's review, as you see it? You said it better than I could ever say it when their motion was simply, you've heard the stuff, because that's what it was. I said, let's not argue that issue. Let's assume that you are correct and their 50B motion fails. What's the consequences for our review? The consequence for your review is the new trial standard, and in the Fifth Circuit, they have said you have to have a, quote, absolute absence of evidence. That is a very high threshold that they have to show to have a new trial. Evidence with regard to either obviousness or anticipation. The other issues remain in the case. The on-sale bar and so on remain. The on-sale bar issue would remain. The filing date issue would remain. But the on-sale bar issue, the judge really weighed that evidence. It shows in his inequitable conduct opinion, and the jury obviously weighed the evidence. There wasn't any evidence that this thing was ready for patenting. I mean, the way you prove ready for patenting is, what was the functionality of it on a particular date? I'm going to talk, I'm going to take the depositions of the people who were involved with this. What was the status of this? What was done? What were the changes? No testimony on that whatsoever. You had testimony of a system in place that the inventor says was not complete, was not operational. That's the evidence you have. There's no way, shape, or form that Hyundai met the clear and convincing standard to show this was ready for patenting. The read-me-first manual, you know what Mr. Klausner said, why that's ready for patenting? Because he misread that manual. That manual was a pre-copy manual under a confidentiality order. He read part of that manual as saying that the disks containing the software were shipped past tense. And based on that being, I think it was actually, quote, was shipped. And he was questioned on that on cross. And he said that's why it was ready for patenting. That was a proposed kind of manual. It was in synopsis, it was an overview. It was not, by any way, shape, or form, a disclosure detailed enough for one of ordinary skill in the art to make that invention. There were no flow charts. There was just simply a couple of functionalities that were set forth. And most of the text in the manual was something you'd have in any system. You want to print what's on the screen? Press the print button. Here's how you install the floppy disk. Things, you know, mundane things like that. There wasn't any testimony that that was a sufficient disclosure to one of ordinary skill in the art to make this invention. The robotics case says you have to have an enabling disclosure before something can be, before the on-sale bar is triggered. But the real essence that you're referring to the invention, though, is the last step. Is that competitive showing to the customer that the price scheme is presented to the customer. That's the final step. That is a specific step of the claim, the final step of the claim, that wasn't in the prior art. The claim as I read it doesn't show a competitive price, though. It doesn't say competitive price. It just says a price. It's supposed to be a proposal that was intended to be conveyed to a customer. Whether it's competitive or not, you're saying it has to be a competitive price. Well, I'm saying it has to be a price that you intend to show to the customer and you don't show the invoice price for a part and then say to the customer, this part cost me $10, but I'm going to have to charge you $20. You don't do that. So it's not whether the price was competitive or not. It's that it was a price intended to be conveyed to the customer. The claim goes to the anticipation problem, doesn't it? That's correct. The claim does not foreclose a dealer from disclosing wholesale price, does it? The claim just says that a proposal is prepared, intended to be conveyed to a customer. It wouldn't foreclose a dealer for saying we have the part, it's $12, and wholesale price is $8. I don't know that any dealer would want to do that, but the claim doesn't foreclose it. There was testimony. I believe Mr. Gump testified. He was asked that question. You don't disclose this type of information to a customer. What relevance is that to the claim? It's got to be information in the proposal that is intended to be conveyed to a customer, and the evidence was that you don't convey a 300% or 100% markup to a customer. Putting all this aside, being very charitable to Hyundai's position on anticipation, the evidence about IDB 2000 was conflicting. On the one hand, you have Fry, who was chairman of the company, in charge of overall development, contributing technically to the project. He says electronics parts catalog, a backroom system. You have the contract that's in the appendix, Exhibit 138. It's the contract Bell & Howell did with Chrysler for their system, and it says an electronics part catalog capable of displaying an image from the parts catalog. That's what it was. So there was conflicting evidence, and any evidence involving customer service was simply that this thing worked really fast and enabled the parts person to locate the part very, very quickly, and it came up on the screen very quickly. Thank you. Thank you. Mr. Sheriff, putting aside for the moment your view of the cleanliness of the on-sale bar issue, if you had to pick one issue on which you want to stand, what is that issue? We're a court of errors. We don't make them, we correct them. What I'm trying to find out is what's the most significant error you think the trial judge made that entitles you to any remedy at all from us? Well, I think in terms of its potential effect on the law and future litigation, the filing date error is the most significant. You want us to correct the law rather than win the case. Well, that would entitle us to a new trial at a minimum. As between on-sale bar and anticipation, I think they're both equally strong as grounds for reversing. The nice thing about the on-sale bar issue is that you don't even have to reach the waiver question in order to invalidate the patent on that basis. Let me first provide the record sites that I promised. Klausner's obviousness testimony appears at pages 1131-33 and then 1136-37. His cross-examination on that appears at pages 1150-51, and our counsel's closing argument on obviousness appears at page 1668. Let me first address the proposal issue and the price element with respect to the anticipation argument. Orion's entire strategy for defeating anticipation was this distinction between retail and wholesale prices, and that distinction doesn't work for three independent reasons. Number one, they put on no evidence at all that the IDB-2000 system did not teach that element of the patent. Their entire case was based on a turning argument. Number two, Mr. Gump, who was the steward of the IDB-2000 system for Bell & Howell, testified without contradiction that the wholesale price could be suppressed in the IDB-2000 system. You didn't even have to show the wholesale price. And that's at page 1055 of the appendix. And third, as construed by the district court, the proposal element doesn't require that all price information be shown to the customer. All the proposal is is simply information that's intended for conveyance to the customer. It doesn't specify the manner or the form in which that information is conveyed. It can be conveyed orally. There's no requirement that you turn the computer screen towards the customer or no requirement in the claim that you print out a specific proposal that shows all the prices. All it requires is that some information, some price information, if we're talking about Claim 7, is intended for conveyance to the customer. And in that regard, it's a lot like this court's decision in the Exergen case earlier this year in which the court held that the fact that a piece of prior art does something in addition to what the patent claims require doesn't defeat the anticipation case. On the readiness for patenting issue, readiness for patenting is established by three undisputed facts. Mr. Scherer, you're well into your rebuttal time, and thank you very much. The case is submitted as presented. Thank you, Your Honor.